**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| OCEAN FARM GEAR & SERVICES, LLC (d/b/a FLIPFARM USA)<br><br>Plaintiff,<br><br>v.<br><br>FLIPFARM SYSTEMS LIMITED,<br><br>Defendant. | Civil No. _____ |

**COMPLAINT (INJUNCTIVE RELIEF SOUGHT)**

The Plaintiff Ocean Farm Gear & Services, LLC, (d/b/a FlipFarm USA) (the "Plaintiff" and/or "OFG"), hereby complains against the Defendant FlipFarm Systems Limited (the "Defendant" and/or "FlipFarm"), as follows:

**INTRODUCTION**

1.      This action arises from FlipFarm's wrongful termination of the exclusive United States East Coast and Gulf Coast distributorship that OFG built and operated for FlipFarm for approximately six years.  Over that period, OFG, led by its founder Keith Butterfield, developed FlipFarm's entire United States East and Gulf Coast market for its oyster-farming equipment system from nothing, investing hundreds of thousands of dollars and building a base of approximately seventy active customer accounts.  FlipFarm, by its course of conduct, and explicitly in its own writings to third parties over roughly six years, repeatedly recognized OFG as its exclusive United States East Coast and Gulf Coast distributor and acknowledged OFG's defined geographic territory running from the coast of Maine to the coast of Texas.  In early 2026, in the midst of Keith's battle with cancer, FlipFarm surreptitiously solicited OFG's customer list and transition cooperation, and assured Keith in his final days that his family had "nothing to worry

1

about," and then—within months of Keith's death—sent OFG a written notice purporting to terminate the distributorship without good cause.

2.      OFG brings this action to recover its losses and the value of the distributorship and its business goodwill, and for injunctive and other relief, under the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361-1370 (the "Maine Franchise Laws"); the Maine Farm Machinery, Forestry Equipment, Construction Equipment and Industrial Equipment Dealerships Act, 10 M.R.S. §§ 1285-1298 (the "Maine Dealerships Act"); and the common law.

## PARTIES

3.      The Plaintiff, OFG, is a Maine limited liability company doing business as FlipFarm USA, with its principal place of business in Portland, Maine.

4.      OFG is a citizen of the State of Maine because its sole member, Kevin Butterfield, is domiciled in the State of Maine and is a citizen of the State of Maine.

5.      The Defendant, FlipFarm, is a New Zealand company that manufactures the FlipFarm oyster-farming equipment system and distributes that system through distributors in the United States and other countries; FlipFarm is a citizen or subject of a foreign state.

## JURISDICTION

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the OFG's claims occurred in this district.

## FACTUAL BACKGROUND

25804142.1

## I.    Background of FlipFarm

7.    FlipFarm is a New Zealand company that designs and manufactures farming equipment, including a semi-automated oyster cultivation system for commercial oyster farmers. The system integrates specialized floating baskets, longline infrastructure, and purpose-built mechanical equipment—driven by the vessel's outboard motor and by electrically powered haul and handling equipment—into a single farming platform.

8.    The floating baskets hold oysters throughout the growing cycle, from 2mm seed through harvest, using spat inserts fitted to the baskets, while allowing water circulation and uniform growth. The baskets are suspended from longline infrastructure with an integrated axle that permits both vertical and lateral motion, promoting desirable uniform shell growth and deep cup development, and enabling high-density nearshore cultivation.

9.    A key component is the Helicat flipping system, a catamaran-mounted mechanical device. As the boat is driven down the longline under the power of its outboard motor, the Helicat individually rotates each basket to expose oysters to the air, controlling biofouling—including barnacles, algae, and other marine growth—without chemicals or pressure washing, while promoting stronger shells and more uniform development.  Separately, a battery-powered haul line drives two essential pieces of equipment, the filling station and the emptying station, enabling a single operator to fill or empty multiple baskets per minute with minimal manual lifting. FlipFarm also produces a fully integrated power boat, or "barge," and fully automated electrical sorting equipment that grades oysters by size.

10.    According to FlipFarm, the integrated system is designed to improve every stage of commercial oyster production, from deployment of juvenile oysters through growing, biofouling management, harvesting, and sorting, increasing labor productivity, improving oyster

3

25804142.1

quality and yield, reducing repetitive manual work, and lowering operating costs through semi-automated farming processes.

11.    FlipFarm distributes its products through authorized distributors for certain geographic territories in the United States, Canada, Europe, and Asia.

12.    Among other things, FlipFarm's distributors do the following: market and sell FlipFarm products, train the ultimate purchasers of FlipFarm products in the proper and effective use of FlipFarm products, explain product care to its purchasers and ensure that they understand the information, and respond to the purchasers' product care information inquiries concerning the FlipFarm product, among other tasks.

**II.    Establishment of OFG as an Exclusive Distributorship/Franchise**

13.    The relationship between the parties began at the end of November of 2019, when Keith Butterfield approached Aaron Pannell, FlipFarm's Managing Director and Founder, about adapting the FlipFarm system for his oyster farm in Maine.

14.    Shortly thereafter, Keith moved from prospective customer to prospective distributor, telling Mr. Pannell that he was excited to be the first to bring the FlipFarm system to the United States. A true and accurate copy of the above referenced communication is attached hereto as Exhibit A.

15.    In early 2020, Keith flew to New Zealand to view the FlipFarm system and meet Mr. Pannell.

16.    On March 27, 2020, in connection with placing his first large wholesale order, Keith wrote to Mr. Pannell: "I'm making arrangements to become a FlipFarm Distributor Agent. I formed a new company: 'Ocean Farm Gear & Services.'"  A true and accurate copy of the above referenced communication is attached hereto as Exhibit B.

25804142.1

17.     OFG was formed on March 20, 2020, as a Maine limited liability company for the specific purpose of distributing the FlipFarm system in the United States. A true and accurate copy of OFG's Certificate of Formation is attached hereto as Exhibit C.

18.     FlipFarm then equipped OFG to distribute and manufacture in the United States.

19.     In September 2020, Mr. Pannell sent OFG the files for a full set of machinery and confirmed that he was "happy for machinery to be built over there," authorizing United States manufacturing of the equipment. FlipFarm's patent reached only the independent basket rotation, not the machinery.  A true and accurate copy of the above referenced communication is attached hereto as Exhibit D.

20.     Since 2020, OFG has been the authorized United States East Coast and Gulf Coast (the "OFG Territory") distributor of FlipFarm products. To service the OFG Territory, OFG maintains a business location in Maine and travels across the OFG Territory.

**III.     FlipFarm's Acknowledgement of OFG's Exclusive Distributorship/Franchise**

21.     Beginning in 2020 and continuing through 2026, FlipFarm repeatedly designated OFG, in writing and to third parties, as its exclusive distributor in the OFG Territory.

22.     In October 2020, in response to Keith letting Mr. Pannell know he had established a United States FlipFarm distribution site, flipfarmusa.com, Mr. Pannell sent FlipFarm's logo for use on the website and wrote "I think you should also make the point in the Bio that Keith invested considerable time and money to travel to the other side of the world to see first hand this system operating at scale. Keith is the only US farmer who has done this and it shows his commitment and to be honest is one of the key reasons I was confident to have Keith as our Eastern US distributor." A true and accurate copy of the above referenced communication is attached hereto as Exhibit E.

25804142.1

23.    On December 3, 2020, Mr. Pannell wrote to a prospective customer that he had copied "Keith Butterfield who is our US east coast distributor." A true and accurate copy of the above referenced communication is attached hereto as Exhibit F.

24.    On February 18, 2021, Mr. Pannell told a prospective customer that "any sales into US east coast are done through our US distributor." A true and accurate copy of the above referenced communication is attached hereto as Exhibit G.

25.    On May 14, 2022, Mr. Pannell referred a prospective customer to "[FlipFarm's] US East coast distributor Keith Butterfield."  A true and accurate copy of the above referenced communication is attached hereto as Exhibit H.

26.    In November 2024, FlipFarm circulated new website "distributor pages" that placed OFG alongside FlipFarm's distributors in Canada, Japan, Ireland, France, and Italy.  A true and accurate copy of the above referenced communication is attached hereto as Exhibit I.

27.    On January 25, 2026, FlipFarm's Sales Manager Matt Pigou introduced a United States prospect to Keith, stating: "We have a distributor who handles the east coast of USA . . . Keith Butterfield."  A true and accurate copy of the above referenced communication is attached hereto as Exhibit J.

28.    As late as March of 2026—two weeks before Keith Butterfield's death—FlipFarm polled OFG together with its Japanese, Irish, Italian, Canadian, and United States West Coast distributors regarding axle stock ahead of a design change, treating OFG as one of its distributors.

29.    Further FlipFarm communications confirmed not only the existence but the bounds of OFG's distributorship.

30.    For example, on February 22, 2026, in response to OFG's support of a potential customer in Belize, the Global Sales and Marketing Manager for FlipFarm, Cam Everett,

6

25804142.1

attempted to block a sale by OFG to the Belize customer on the grounds that "Belize sits outside [of OFG's] geographic distributorship."  A true and accurate copy of the above referenced communication is attached hereto as Exhibit K.

31.    On March 25, 2026, in response to an inquiry about whether OFG covered a grower in Alaska, Mr. Everett answered, "We deal with Alaska directly - it's treated the same as Canada," confirming OFG's United States distributorship territory. A true and accurate copy of the above referenced communication is attached hereto as Exhibit L.

**IV.    OFG's Exclusive East and Gulf Coast Distributorship**

32.    Over a period of approximately six years, OFG built FlipFarm's entire United States Atlantic and Gulf market from nothing.

33.    By early 2026, OFG held approximately seventy active customer accounts, a comparable bank of prospects, and hundreds of leads.

34.    Throughout the parties' distributorship relationship, Defendant FlipFarm repeatedly acknowledged Plaintiff OFG's success in developing the United States market for FlipFarm products and encouraged OFG to continue making significant investments to expand that market.

35.    In reliance on FlipFarm's acknowledgments and encouragement, OFG expended substantial funds and capital to build OFG's own brand and, by extension, the FlipFarm brand in the United States.

36.    To support and protect FlipFarm's goodwill during the introduction of the FlipFarm product to the United States market, OFG devoted thousands of man-hours to diagnosing and resolving product-introduction issues, work that FlipFarm did not reimburse.

37.    OFG invested hundreds of thousands of dollars to stock FlipFarm product, to build and operate a model farm for product development and demonstration, and to develop United

7

States–market components, and it reinvested FlipFarm-related earnings to prove the product and build the market; FlipFarm did not reimburse these expenditures.

38.    To develop the FlipFarm market in the United States, OFG planned and executed a comprehensive marketing and outreach effort, including attending regional trade shows, conferences, and association events to represent and promote the FlipFarm brand.

39.    By way of example, OFG purchased membership in the East Coast Shellfish Growers Association and paid for a full-page FlipFarm advertisement captioned "Distributed by: Keith Butterfield."

40.    FlipFarm also solicited OFG to attend a trade show in Louisiana to represent the FlipFarm brand, which OFG did at its own expense.

41.    In furtherance of United States market development, OFG devoted additional thousands of man-hours to build the model farm; to design, purchase, and operate its own trade-show booth; and to build and run a substantial, independent United States marketing operation under the "FlipFarm USA" name with FlipFarm's knowledge and acquiescence.

42.    In January 2026, OFG shipped its own trade-show booth to the Oyster South show in Houston and thereafter returned it to North Carolina in anticipation that OFG would relocate and manage third-party logistics in coordination with FlipFarm's manufacturing.

43.    Beyond marketing and promotion, OFG ran FlipFarm's United States supply chain by sourcing and driving domestic manufacturing of components, cultivating supplier relationships, and pricing and managing freight to OFG's Portland warehouse, and OFG performed FlipFarm's United States customer service, warranty, and quality-control functions. The foregoing work and investments by OFG were critical to FlipFarm's goodwill and United States market development yet were undertaken and performed without reimbursement by FlipFarm.

25804142.1

44.    OFG purchased FlipFarm product at a distributor price and resold it to United States customers at a markup.

45.    Since OFG's formation, FlipFarm products have comprised nearly 100 percent of OFG's sales.

46.    For years, FlipFarm acknowledged that a written agreement was needed but never delivered one.

## V.    Keith's Illness and FlipFarm Scheme to Usurp OFG's Customer Relationships

47.    On or about November 10, 2025, Keith Butterfield was diagnosed with an aggressive form of cancer which was later deemed to be terminal.

48.    During his time of illness, Keith enlisted his brother Kevin and his sisters Kelly and Karen to assist him in the operation of OFG.

49.    Shortly thereafter, Mr. Pannell became aware of Keith's diagnosis and that Keith would need to devote substantial time and attention to his medical treatment.

50.    Rather than supporting its long-standing distributor during this period, FlipFarm disappointingly appears to have viewed Keith's illness as an opportunity to appropriate for itself the United States market that OFG had spent years developing.

51.    Upon learning of Keith's diagnosis, FlipFarm secretly began implementing a coordinated plan to eliminate OFG as its distributor and assume direct control over the OFG Territory without compensating OFG for the goodwill, dealer relationships, and market infrastructure OFG had created.

52.    Under the guise of collaboration, FlipFarm sought to obtain confidential information regarding OFG's customer network, customer relationships, pricing, inventory, sales history, and business operations for FlipFarm's own benefit.

9

53.     While secretly pursuing this plan, FlipFarm continued to encourage OFG to devote resources toward promoting FlipFarm's products and maintaining the dealer network, thereby increasing the value of the market FlipFarm intended to appropriate.

54.     FlipFarm concealed its true intentions from OFG while OFG continued to expend substantial resources in reliance upon Defendant's representations that the distributorship relationship would continue.

55.     In hindsight, FlipFarm's actions were undertaken intentionally, willfully, in bad faith, and for the purpose of appropriating the benefits of OFG's years of investment while avoiding the cost of developing the United States market itself.

56.     On January 12, 2026, after learning of Keith's illness, Mr. Pannell assured Keith in writing—twice in the same email—that "you will remain as our distributor," and framed a prospective hire, "Ewan," as merely "assisting you with vetting customers, training, assisting with installs." A true and accurate copy of the above referenced communication is attached hereto as Exhibit M.

57.     In late February 2026, following a February 24th call, FlipFarm circulated "meeting notes" that operated as a transition blueprint: OFG would continue trading as Ocean Farm to avoid confusion with FlipFarm's new United States entity; Keith would send FlipFarm a proposal on his distributorship; and a successor, "Ewan," would be brought in with Keith's account histories. A true and accurate copy of the above referenced communication is attached hereto as Exhibit N.

58.     On February 26, 2026, Keith sent FlipFarm a written Letter of Intent—"a letter of agreement to put our relationship in writing." The Letter of Intent is signed by Keith as Principal in OFG's signature block; FlipFarm's signature block was left blank.  A true and accurate copy of

10

the above referenced communication is attached as Exhibit O, and a true and accurate copy of the Letter of Intent is attached as Exhibit P.

59.     The Letter of Intent memorialized OFG as FlipFarm's "exclusive North American distributor for approximately five (5) to six (6) years under a verbal agreement," fixed an exclusive territory of the United States Atlantic and Gulf coastlines "from the coast of Texas to the coast of Maine," and provided for a term terminable for cause only upon a sixty-day uncured material failure of performance standards.

60.     Section 6 of the Letter of Intent made "the death of Keith Butterfield" an express "Acceleration Event" rendering FlipFarm's buyout option immediately exercisable at a price equal to the greater of a $2,000,000 floor or 3.0 times trailing-twelve-month EBITDA.

61.      Section 8, styled "Assignability - Critical Provision," provided that the agreement "shall expressly be assignable by OFG to a qualified successor or purchaser," that assignability was "a material inducement," and that "[a] non-assignable distributorship has no transferable value."

62.     On that footing, FlipFarm organized its demands for OFG's customer base around onboarding "Ewan," repeatedly asking for "[a] list of your customers with a breakdown of what gear they have" so that "Ewan" could understand the customer base. A true and accurate copy of the above referenced communication is attached as Exhibit Q.

63.     Trusting the assurance, Keith—recovering from chemotherapy—dictated the customer book account by account.

64.     Upon information and belief, "Ewan" was never hired, and FlipFarm never disclosed that fact.

25804142.1

65.     Throughout February and March 2026, Keith Butterfield repeatedly pressed FlipFarm for the written agreement.

66.     On March 4, 2026, having completed the customer list FlipFarm requested, he wrote that "the ball is in your court regarding the letter of intent for Distributorship" and that he "expected a response by now." Ex. Q.

67.     On March 9, 2026, he wrote: "I need to have a Distributor agreement please. . . . I need to find a new home for my Distributorship before I pass away. . . . Please put this across the finish line." A true and accurate copy of the above referenced communication is attached hereto as Exhibit R.

68.     On March 15, 2026, Mr. Pannell wrote that FlipFarm had a board meeting that week and would respond on the proposal "by the end of the week at latest." Ex. Q.

69.     FlipFarm never delivered that response.

70.     On March 16, 2026, Keith sent a "Path Forward" email documenting that he had invested hundreds of thousands of dollars stocking product, building a model farm, and developing United States-market components, and proposing a thirty-day transition to a successor at the Letter of Intent's price. Ex. Q.

71.     On March 18, 2026, on a six-minute telephone call two days before Keith Butterfield's death, Aaron Pannell and his wife, Debbie Pannell, told Mr. Butterfield: "We'll work with Kevin and Kelly" and "you have nothing to worry about."

72.     Kevin Butterfield and Leigh Drori overheard the call.

73.     Based on the assurances from Mr. Pannell, Keith, believing that the distributorship he had spent years building was secure and would continue for the benefit of his family and

12

25804142.1

business, chose not to undergo treatments that might have prolonged his life but would have imposed significant physical hardship.

74.     On March 19, 2026, Keith executed a notarized Transfer-on-Death Beneficiary Designation transferring his entire 100% membership interest in OFG to his brother, Kevin Butterfield, effective on his death. A true and accurate copy of the Transfer-on-Death Beneficiary Designation is attached as Exhibit S.

75.     In Keith's mind, this assurance from Mr. Pannell and by extension, FlipFarm, had brought his affairs to a conclusion.

76.     Keith Butterfield died on March 20, 2026.

77.     Upon Keith Butterfield's death on March 20, 2026, OFG—together with its distributorship operations, inventory, in-flight contracts, and customer relationships—passed to Kevin Butterfield, who together with Kelly Butterfield has continued to operate OFG.

78.     OFG continued to operate as FlipFarm's United States distributor through his death and thereafter.

79.     On March 28, 2026—eight days after Keith Butterfield's death—Aaron Pannell sent an email to Kelly and Kevin Butterfield, under the subject "Information for our meeting next week," purporting to reverse FlipFarm's prior assurances (the "March 28th Email"). A true and accurate copy of the above referenced communication is attached as Exhibit T.

80.     FlipFarm formally declined Keith's Letter of Intent and its buyout, stating that it was "not something we could have ever progressed with."

81.     In the March 28th Email, FlipFarm asserted that "the assignment of a distributor is a personal thing" and "definitely not something that would be considered a tradeable or assignable

13

asset at any time," and concluded that "the only option for FlipFarm is to communicate directly with our customer base, acting directly as a distributor." Ex. T.

82. The March 28th Email alleged no failure by OFG to perform. To the contrary, it acknowledged that "Keith and Kelly, lately supported by Kevin, have worked hard to secure a number of orders over recent times." Ex. T.

83. FlipFarm's proposed "wind-down" would honor only accepted-quote orders at wholesale; require OFG to pay all outstanding invoices; route unordered quotes to FlipFarm for requoting against only a five-percent "finders fee" capped at twelve months; buy back unsold stock at a price that "may be less than the original purchase price"; and allowed FlipFarm to "assume control of all channels of communication," including reassignment of the FlipFarmUSA website, with OFG to "supply customer database including all historical transactions" and to "cease to use FlipFarm name and branding." Ex. T.

84. In the weeks around and after Keith Butterfield's death, FlipFarm began to take actions to market directly in the United States.

85. For example, it asserted ownership and control over the United States inventory, instructed OFG to route all communications through FlipFarm, issued contradictory container-routing instructions that forced OFG to redirect three inbound containers back to its Maine warehouse at the height of the growing season, and reached OFG's customers directly.

86. In the period leading up to FlipFarm's wrongful termination of the distributorship, FlipFarm increasingly failed and refused to respond to these customer concerns, ignored repeated requests from OFG for technical support and assistance, and ceased providing the level of responsiveness and cooperation that had long characterized the parties' relationship. FlipFarm's unexplained pattern of disregarding customer issues and OFG's repeated communications

14

reflected a deliberate withdrawal from its contractual and commercial obligations, damaged OFG's reputation with customers who reasonably expected OFG to obtain timely assistance from FlipFarm, and furthered FlipFarm's scheme to undermine OFG's business while positioning itself to assume direct control of the market that OFG had spent years developing.

87.    In June 2026, FlipFarm supplied its current 2026 product manuals directly to a United States grower while withholding those manuals from OFG and from its Canadian distributor and made direct contact with OFG's customers.

Notwithstanding the March 28 Email, OFG has continued to function as the distributor—paying FlipFarm's invoices, receiving goods on in-flight orders, and invoicing and collecting from United States customers.

### VI.    FlipFarm's Purported Termination of OFG's Distributorship

88.    OFG's counsel issued a demand letter to FlipFarm on May 11, 2026, which passed without response until June 19, 2026.

89.    On June 19, 2026, counsel for FlipFarm, sent an email to OFG's counsel, which email attached a letter dated June 19, 2026 (the "June 19th Termination Letter"). A true and accurate copy of the June 19th Termination Letter is attached as Exhibit U.

90.    The June 19 Termination Letter states, in relevant part:

> While disputed, to the extent Ocean Farm Gear contends that any dealer, distributorship, franchise, reseller, sales, referral, brand-use, or other commercial relationship exists between Ocean Farm Gear and FlipFarm, FlipFarm hereby provides notice that it is terminating and will not continue any such relationship, effective 120 days from receipt of this letter, unless an earlier effective date is legally permitted or otherwise agreed in writing by the parties.

91.    The June 19th Termination Letter was not sent by registered, certified, or other receipted mail, delivered by telegram or personally delivered to OFG.  *See* 10 M.R.S. § 1366(1) (requiring that any notice of termination or nonrenewal be delivered by such means).

25804142.1

92. FlipFarm failed to state any "good cause" for this termination in writing or otherwise in its letter or anywhere else. *See* 10 M.R.S. § 1363(3)(B).

93. At or around the time of the sending of the June 19th Termination Letter, OFG's distributorship and business goodwill were valued from approximately $3.0 million to approximately $6.25 million.

94. FlipFarm sales account for nearly 100 percent of OFG's business, and the termination of its distributorship is essentially a death knell for OFG.

95. Over the years, OFG has built a strong customer base to which it sells and services FlipFarm products.

96. With the termination of OFG's distributorship, OFG's customers will be forced to seek other distributors for the sales and service of their FlipFarm equipment.

97. This termination will irreparably harm OFG's relationship with its customers because these customers will be forced to contract with others for the sales and service of FlipFarm products. OFG has existing service commitments with a number of its customers.

98. FlipFarm's termination of OFG's distributorship will have a significant impact on OFG's business reputation and goodwill with its customers, and such injuries cannot be fully compensated with monetary damages.

99. Many of OFG's accounts have expressed astonishment and disappointment with FlipFarm's course of conduct with respect to OFG.

100. As of June 30, 2026, OFG held $430,929.99 in customer payments and deposits for product not yet received, consisting of $356,610.80 and $74,319.19 in deposits on sales orders not yet shipped. Many of these customers elected to pay in full, in reliance on delivery dates FlipFarm

16

had assured. As of that date, these payments and deposits stood at high risk of having to be refunded, following FlipFarm's unannounced re-routing of product to North Carolina.

101.    As of that same date, OFG held $274,669.64 in cash. OFG's obligations on these customer payments and deposits therefore exceeded its available cash by approximately $156,260 and exceeded OFG's total equity of $255,856.86.

102.    These obligations arise directly from FlipFarm's failure to supply. Customers who ordered equipment and paid for it have not received it, and OFG has been required to return their money. In July 2026, OFG refunded $252,686 to a single customer, Everglades Oysters LLC, because FlipFarm did not deliver goods that customer had ordered and paid for. That refund alone approached OFG's entire June 30 cash position.

103.    In addition, OFG has paid FlipFarm $87,970.48 in deposits for product that FlipFarm has not delivered, including product presently on the water. This is not lost profit or goodwill — it is OFG's cash, in FlipFarm's hands, for property FlipFarm is withholding.

104.    OFG cannot satisfy its remaining obligations on these customer payments and deposits from cash on hand if FlipFarm continues to withhold product. FlipFarm products constitute nearly 100% of OFG's sales, and OFG has no alternative source of supply. FlipFarm's continued withholding of product is an existential threat to OFG's business, not merely its profits.

105.    OFG's distributorship was profitable and growing.

106.    OFG's net income was $280,886 in 2024 and $530,885 in 2025 (a net margin of 26.8%), and its lone recent loss year, 2023, is explained by a one-time inventory write-off of $596,399 attributable to FlipFarm's own design changes.

17

107.    By June 17, 2026, OFG had booked $2,145,248 in 2026 sales orders, a pace annualizing to approximately $4.66 million, with a further approximately $4.9 million in customer estimates outstanding.

108.    FlipFarm's conduct has caused, and continues to cause, OFG damages accruing at a rate of several thousand dollars per business day, together with the ongoing and irreparable loss of customer relationships, goodwill, and market position as OFG's customers, cut off from supply, convert to competing systems.

## COUNT I
## VIOLATION OF THE MAINE FRANCHISE LAWS
### (10 M.R.S. §§ 1361-1370)

109.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

110.    The Maine Franchise Laws define a "franchise" as "an oral or written arrangement for a definite or indefinite period pursuant to which a manufacturer grants to a dealer or distributor of goods a license to use a trade name, trademark, service mark or related characteristic and in which there is a community of interest in the marketing of goods and related services." 10 M.R.S. § 1361(3).

111.    OFG is a "franchisee"—a distributor of goods located within Maine to whom a franchise was granted—and FlipFarm is a "franchisor" and "manufacturer," which the statute defines to include a nonresident entity that manufactures, assembles, or imports goods for distribution through distributors.

112.    The FlipFarm system and its associated equipment and machinery constitute "goods" within the meaning of 10 M.R.S. § 1361(8), which includes agricultural, farm, commercial, or business equipment and machinery.

25804142.1

113.    The parties' arrangement is a franchise: FlipFarm granted OFG a license to use the FlipFarm trade name and marks—including through the "FlipFarm USA" brand and the FlipFarmUSA website—and there was a community of interest between them in the marketing of the FlipFarm system in the United States.

114.    Under 10 M.R.S. § 1363(3)(A), (B), and (C), it is unlawful for a manufacturer to act in a manner that is prejudicial to a distributor or dealer by threatening to cancel a franchise or a contractual agreement between the manufacturer and the distributor; to cancel, terminate, fail to renew, or refuse to continue a franchise relationship unless the manufacturer has satisfied the notice requirement of section 1366, has acted in good faith, and has good cause; or to terminate, fail to renew, or refuse to continue a franchise relationship without good cause. 10 M.R.S. § 1363.

115.    It is also unlawful under 10 M.R.S. § 1365 for a manufacturer or franchisor, without due cause, to terminate a franchise or to fail to renew a franchise on terms then equally available to all its distributors or dealers.

116.    FlipFarm terminated OFG's franchise without good cause.

117.    FlipFarm alleged no failure by OFG to perform, and in fact acknowledged OFG's work in securing orders; its stated rationales—that a distributorship is "personal" and not "assignable"—do not constitute good cause as defined in 10 M.R.S. § 1363.

118.    FlipFarm further engaged in conduct that was arbitrary, in bad faith, or unconscionable and that caused damage to OFG, in violation of 10 M.R.S. § 1363(1).

119.    Under 10 M.R.S. § 1362, a dealer, distributor, or franchisee damaged by a violation of the chapter may bring an action to enjoin the violation and to recover damages arising from the violation.

19

120.    As a direct and proximate result of FlipFarm's violations of the Maine Franchise Laws, OFG has been damaged in an amount to be determined at trial and is entitled to injunctive relief and damages under 10 M.R.S. § 1362.

**COUNT II**
**VIOLATION OF THE MAINE DEALERSHIPS ACT**
**(10 M.R.S. §§ 1285-1298)**

121.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

122.    OFG is a "dealer" within the meaning of 10 M.R.S. § 1285(2)—a person primarily engaged in the business of retail sales of farm implements, farm machinery, industrial equipment, attachments, accessories, and repair parts—by virtue of its retail sale of the FlipFarm oyster-farming equipment system and its components to United States growers.

123.    FlipFarm is a "supplier" within the meaning of 10 M.R.S. § 1285(6)—a manufacturer or distributor of inventory that enters into a dealer agreement with a dealer.

124.    The parties' arrangement is a "dealer agreement" within the meaning of 10 M.R.S. § 1285(3), which includes a written or oral contract by which the dealer is granted the right to sell or distribute goods or to use a trade name, trademark, service mark, or commercial symbol.

125.    FlipFarm purported to terminate the dealer agreement effective 120 days after its June 19th Termination Letter without stating or possessing good cause for termination. In doing so, FlipFarm attempted to use the threatened termination as leverage to coerce OFG into surrendering its customer relationships, market goodwill, distribution infrastructure, proprietary business information, and other assets and resources that OFG had developed through years of investment and effort.

126.    FlipFarm conduct constituted a termination without good cause and an unlawful attempt to compel OFG to relinquish the value of its dealership, in violation of 10 M.R.S. § 1287.

25804142.1

127. Under 10 M.R.S. § 1294, where a supplier accomplishes a termination without good cause, the dealer is entitled to recover its losses and damages, together with the costs of the action and reasonable legal fees, including compensation for the value of the agreement and the goodwill of the dealer's business, and the court may grant equitable relief including declaratory and injunctive relief.

128. At all relevant times, the dealer agreement between FlipFarm and OFG imposed upon each party an obligation to act in good faith pursuant to 10 M.R.S. § 1298(1).

129. Rather than dealing fairly and honestly with OFG, FlipFarm acted in bad faith by, among other things, concealing its plan to terminate OFG's Dealership, refusing to respond to OFG's legitimate business concerns, undermining OFG's efforts to continue and transfer the Dealership, withholding information necessary for OFG to protect its contractual rights, and pursuing a scheme to appropriate for itself the market, customer relationships, and goodwill that OFG had developed throughout the assigned territory. FlipFarm's conduct was dishonest, commercially unreasonable, and inconsistent with reasonable standards of fair dealing in the farm equipment industry and therefore breached its statutory obligation to act in good faith under 10 M.R.S. § 1298(1).

130. On March 19, 2026, Keith Butterfield executed a notarized Transfer-on-Death Beneficiary Designation transferring his entire 100% membership interest in OFG to his brother, Kevin Butterfield, effective on his death.

131. Despite the qualifications of Kevin and the absence of any legitimate basis for objection, FlipFarm withheld and/or refused its consent to the transfer.

21

25804142.1

132. FlipFarm's refusal was arbitrary, unreasonable, and contrary to 10 M.R.S. § 1291(2), which prohibits a supplier from withholding consent to the transfer of a dealership to a member of the dealer's family, including siblings.

133. As a direct and proximate result of FlipFarm's violations of the Maine Dealerships Act, OFG has been damaged, and is entitled to recover its losses and damages, the value of the agreement and its business goodwill, costs, reasonable legal fees, and equitable relief under 10 M.R.S. § 1294.

## COUNT III
## BREACH OF CONTRACT

134. OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

135. Under Maine law, a claim for breach of contract requires an enforceable contract and (1) breach of a material contract term, (2) causation, and (3) damages.

136. The existence of a contract requires a meeting of the minds—mutual assent to be bound by all material terms—which may be expressly or impliedly manifested and may be established by the parties' course of dealing.

137. An enforceable contract existed between OFG and FlipFarm, formed and confirmed by the parties' roughly six years of dealing, under which OFG served as FlipFarm's exclusive United States distributor for the territory running from Maine to Texas, purchasing FlipFarm product at distributor pricing and reselling it to United States customers, and FlipFarm supplied product and recognized OFG's exclusive territory.

138. The parties' conduct removed any uncertainty as to the agreement's material terms.

139. OFG performed its obligations under the agreement, building and servicing FlipFarm's United States market and paying for the product it ordered.

22

140.    FlipFarm breached the agreement by terminating OFG's exclusive distributorship without good cause, refusing to continue supplying OFG, dealing directly with OFG's customers, and appropriating OFG's customer relationships, website, and goodwill.

141.    As a direct and proximate result of FlipFarm's breach, OFG has suffered damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

142.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

143.    The parties' distributorship was a contract for the sale of goods governed by the Maine Uniform Commercial Code, under which OFG purchased FlipFarm product and resold it to United States customers.

144.    Contracts governed by Maine's Uniform Commercial Code are subject to an implied covenant of good faith, and in certain commercial situations the more onerous obligation of observance of reasonable commercial standards of fair dealing.

145.    Title 10 M.R.S. § 1361(7) likewise imposes on FlipFarm an obligation of "good faith," defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

146.    FlipFarm breached the implied covenant of good faith and fair dealing by soliciting OFG's customer list, account histories, and transition cooperation under the pretext of onboarding a successor who was never hired; by repeatedly assuring OFG that it "w[ould] remain as [FlipFarm's] distributor" and had "nothing to worry about" while planning to take the United States market directly; by promising a board response and never delivering it; and by using Keith Butterfield's death as the occasion to terminate the relationship and appropriate OFG's customer

23

25804142.1

database, website, and goodwill—conduct that deprived OFG of the benefit of its bargain and frustrated its reasonable expectations under the agreement.

147.    As a direct and proximate result of FlipFarm's breach of the implied covenant, OFG has suffered damages in an amount to be determined at trial.

## COUNT V
## PROMISSORY ESTOPPEL

148.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

149.    Maine follows the formulation of promissory estoppel set out in section 90 of the Restatement (Second) of Contracts: a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee, and that does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise.

150.    The promise may be implied from conduct, and the reliance and detriment elements are questions of fact.

151.    FlipFarm made clear and definite promises to OFG, including its repeated designations of OFG as its exclusive United States distributor, its repeated representations that a written agreement would be executed, its written assurance that OFG "w[ould] remain as [FlipFarm's] distributor," and its assurance on March 18, 2026, that FlipFarm would "work with Kevin and Kelly" and that OFG had "nothing to worry about."

152.    FlipFarm should reasonably have expected those promises to induce OFG's action and forbearance, and they did: in reliance, OFG invested hundreds of thousands of dollars building FlipFarm's United States market, reinvested its earnings, disclosed its customer book, cooperated in the transition, and forbore from securing its position by other means.

24

25804142.1

153.    OFG's reliance was reasonable and foreseeable, and OFG suffered substantial detriment as a result. Injustice can be avoided only by enforcement of FlipFarm's promises.

154.    As a direct and proximate result of OFG's detrimental reliance, OFG has suffered damages in an amount to be determined at trial.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**

155.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

156.    During the parties' business relationship, and particularly during the period preceding FlipFarm's termination of the distributorship, FlipFarm, through its officers, employees, and authorized representatives, knowingly made material representations to OFG that FlipFarm intended to continue the parties' longstanding distributorship relationship, that OFG remained FlipFarm's trusted exclusive distributor for the OFG Territory, and that FlipFarm desired OFG to continue investing in the development of FlipFarm's products and customer relationships.

157.    At the time these representations were made, FlipFarm knew they were false or made them in reckless disregard of whether they were true because FlipFarm had already begun implementing a plan to terminate OFG, assume direct control of the OFG Territory developed by OFG, and appropriate for itself the goodwill, customer relationships, and business opportunities that OFG had created over many years.

158.    FlipFarm made these representations for the purpose of inducing OFG to continue devoting substantial time, resources, personnel, and capital to expanding FlipFarm's market presence, servicing customers, maintaining customer goodwill, and refraining from taking steps to protect OFG's own business interests.

159.    FlipFarm intended that OFG rely upon these representations.

25804142.1

160. OFG reasonably and justifiably relied upon FlipFarm's representations by continuing to market FlipFarm's products, maintain inventory, employ personnel, service customers, invest in FlipFarm's brand, and forego alternative business opportunities and protective measures.

161. FlipFarm's representations were false and material.

162. OFG did not know, and had no reason to know, that FlipFarm had already decided to eliminate OFG as its distributor while simultaneously using OFG's continuing efforts to preserve and expand the very market FlipFarm intended to appropriate.

163. As a direct and proximate result of FlipFarm's fraudulent misrepresentations, OFG suffered substantial damages, including, but not limited to, the loss of its distributorship, lost profits, loss of customer goodwill, loss of business value, unreimbursed expenditures, and other consequential damages in an amount to be determined at trial.

164. FlipFarm's conduct was intentional, malicious, and undertaken with conscious disregard for OFG's rights, thereby entitling OFG to an award of punitive damages.

## COUNT VII
## UNJUST ENRICHMENT
### (In the Alternative)

165. OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

166. Through OFG's efforts over approximately six years, OFG developed FlipFarm's United States East Coast and Gulf Coast market from nothing, including by investing substantial time, labor, and capital; building and servicing a customer base; developing supply-chain and manufacturing relationships; providing training, warranty, and quality-control functions; and promoting and protecting the FlipFarm brand and goodwill in the territory.

26

25804142.1

167. FlipFarm knowingly accepted and retained the benefits of OFG's investments and efforts, including the creation and expansion of FlipFarm's customer relationships, market presence, and goodwill in the OFG Territory.

168. FlipFarm then sought to appropriate those benefits for itself without compensating OFG, including by soliciting and obtaining OFG's customer list, account histories, and transition cooperation; asserting control over OFG's channels of communication and branding; and communicating directly with OFG's customers while purporting to terminate OFG's distributorship without good cause.

169. As a result, FlipFarm has been unjustly enriched at OFG's expense.

170. It would be inequitable and against good conscience to permit FlipFarm to retain the benefits conferred by OFG without paying OFG the reasonable value of those benefits, including the value of the market, customer relationships, and goodwill OFG created and FlipFarm sought to take for itself.

171. As a direct and proximate result of FlipFarm's unjust enrichment, OFG has suffered damages in an amount to be determined at trial, including restitution and/or disgorgement of benefits wrongfully retained by FlipFarm.

## COUNT VIII
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE BUSINESS RELATIONS

172. OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

173. OFG had existing contractual relationships and/or advantageous business relationships with its customers in the OFG Territory, including ongoing sales, service commitments, and repeat-customer relationships, as well as a reasonable expectancy of future business with those customers and with identified prospects and leads developed by OFG.

25804142.1

174.    FlipFarm knew of OFG's customer relationships and business expectancies, including because FlipFarm repeatedly acknowledged OFG's role as its exclusive distributor in the territory and because FlipFarm solicited and obtained OFG's customer list and account histories.

175.    Notwithstanding that knowledge, FlipFarm intentionally and improperly interfered with OFG's contractual and advantageous business relationships and prospective business relations by, among other things: (a) communicating directly with OFG's customers and directing that communications be routed through FlipFarm rather than OFG; (b) withholding information and support necessary for OFG to service customers; (c) asserting control over OFG's channels of communication and branding; (d) disrupting OFG's ability to supply customers, including through contradictory container-routing instructions; and (e) attempting to divert OFG's customers and prospective customers to deal directly with FlipFarm.

176.    FlipFarm's interference was improper, undertaken in bad faith, and was not justified by any legitimate business reason, but instead was part of FlipFarm's scheme to usurp the market, customer relationships, and goodwill that OFG had developed.

177.    FlipFarm's conduct caused actual disruption of OFG's customer relationships and business expectancies, including lost sales, lost service opportunities, harm to OFG's reputation and goodwill, and the forced migration of customers to alternative suppliers and/or competing systems.

178.    As a direct and proximate result of FlipFarm's tortious interference with OFG's contractual relations and prospective business relations, OFG has suffered damages in an amount to be determined at trial.

25804142.1

179.    To the extent FlipFarm's conduct was willful, malicious, or undertaken with conscious disregard of OFG's rights, OFG is entitled to recover punitive damages.

## COUNT IX
## DECLARATORY JUDGMENT
### (28 U.S.C. §§ 2201-2202; Fed. R. Civ. P. 57)

180.    OFG realleges and incorporates herein by this reference the allegations in the preceding paragraphs as if fully set forth herein.

181.    An actual, present, and justiciable controversy exists between OFG and FlipFarm concerning OFG's right to continue limited use of the "FlipFarm USA" name and the flipfarmusa.com website in connection with continuing distributorship activities and customer communications.

182.    On June 19, 2026, FlipFarm sent a letter demanding that OFG cease using the FlipFarm name and take down the flipfarmusa.com website, thereby creating an immediate dispute over OFG's rights and legal obligations regarding such use.

183.    For years prior to the June 19, 2026 demand, FlipFarm tolerated and encouraged OFG's use of the FlipFarm USA name and related branding in connection with distributorship activities, including FlipFarm's own use of the "FlipFarm USA" name on invoices to OFG and in other communications.

184.    FlipFarm held OFG out as FlipFarm's exclusive U.S. East/Gulf Coast distributor and allowed OFG to operate under the FlipFarm USA name and to use the flipfarmusa.com domain in connection with distributorship activities and customer communications.

185.    By virtue of FlipFarm's conduct, including its tolerance, encouragement, and use of the FlipFarm USA name and branding in commercial dealings with OFG and others, OFG was granted and acted under an implied license to use the FlipFarm name, marks, and related branding in connection with distributorship activities.

25804142.1

186. Separately and in the alternative, FlipFarm's conduct constitutes acquiescence to OFG's use of the FlipFarm USA name, marks, and related branding, such that FlipFarm should be barred from now asserting infringement or purporting to terminate permission for OFG's continued limited use in connection with winding down or continuing distributorship activities and customer communications.

187. Separately and in the alternative, FlipFarm unreasonably delayed in objecting to OFG's use of the FlipFarm USA name, marks, and related branding, and OFG has been prejudiced by that delay, such that laches bars FlipFarm from demanding immediate cessation of use or takedown of flipfarmusa.com in the context of OFG's winding down or continuing distributorship activities and related customer communications.

188. OFG seeks a declaration under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that OFG holds an implied license to use the FlipFarm name, marks, and related branding, including the FlipFarm USA name and flipfarmusa.com, in connection with distributorship activities, including winding down and customer communications.

189. In the alternative, OFG seeks a declaration that FlipFarm is barred by acquiescence from asserting infringement or terminating OFG's permission to continue limited use of the FlipFarm USA name and flipfarmusa.com in connection with winding down or continuing distributorship activities and customer communications.

190. In the alternative, OFG seeks a declaration that FlipFarm is barred by laches from asserting infringement or terminating OFG's permission to continue limited use of the FlipFarm USA name and flipfarmusa.com in connection with winding down or continuing distributorship activities and customer communications.

25804142.1

191.    OFG further seeks a declaration that OFG's continued limited use of the FlipFarm USA name and flipfarmusa.com in connection with winding down or continuing distributorship activities and customer communications is lawful and does not infringe FlipFarm's rights under the circumstances described herein.

192.    Pursuant to 28 U.S.C. § 2202, OFG seeks such further and necessary relief as the Court deems proper to effectuate the declarations requested above, including injunctive relief consistent with the Complaint's Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Ocean Farm Gear & Services, LLC (d/b/a FlipFarm USA) respectfully requests that this Court enter judgment in its favor and against the Defendant FlipFarm Systems Limited as follows:

A.    Issue a Temporary Restraining Order and/or Preliminary Injunction immediately, consistent with the Proposed Order Attached to OFG's Motion for Temporary Restraining Order and Preliminary Injunction.

B.    Enter Judgment for OFG and against FlipFarm on each and every count in the Complaint;

C.    Award damages to OFG in an amount to be determined at trial;

D.    Award reasonable attorneys' fees and costs, pursuant to 10 M.R.S. § 1294; and

E.    Award such other relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

The Plaintiff Ocean Farm Gear & Services, LLC (d/b/a FlipFarm USA) hereby demands a trial by jury on all issues so triable.

25804142.1

Dated: July 14, 2026

Respectfully submitted,

*/s/ Timothy J. Bryant*
Timothy J. Bryant, Esq. (Bar No. 7736)
PRETI, FLAHERTY, BELIVEAU &
PACHIOS, LLP
One City Center, P.O. Box 9546
Portland, ME, 04112-9546
(207) 791-3000
tbryant@preti.com

32

25804142.1